## UNITED STATES DISTRICT COURT
## DISTRICT OF KANSAS

| | |
|---|---|
| **AMALIA MENDEZ,**<br>3613 Gunnison Dr.<br>Lawrence, Kansas 66049<br><br>       Plaintiff,<br><br>v.<br><br>**SECURITAS SECURITY SERVICES,**<br>**USA, INC.,**<br><u>Serve Registered Agent:</u><br>National Resgitered Agents, Inc.<br>120 South Central Ave.<br>Clayton, Missouri 63105<br><br>       Defendant. | Case No.<br><br>Division<br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT

COMES NOW, Plaintiff Amalia Mendez, by and through the undersigned counsel, and for her Complaint against Defendant Securitas Security Services, USA, Inc., states and avers to the Court as follows:

## TYPE OF ACTION

1.     This is an action for compensatory and punitive damages arising under the Missouri Human Rights Act, R.S.Mo. § 213.010, *et seq*. ("MHRA") and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq*. ("Title VII").

## PARTIES

2.     Plaintiff resides in Lawrence, Douglas County, Kansas.

3.     At all times mentioned herein, Defendant Securitas Security Services, USA, Inc. was a New Jersey corporation, registered to do business in the States of Missouri and Kansas, employed at least six (6) employees in the State of Missouri, employed at least fifteen (15)

employees for each working day in each of twenty (20) or more calendar weeks in the current or preceding calendar year, and was an "employer" within the meaning of the MHRA and Title VII.

4.      At all times mentioned herein, the perpetrators described in this Complaint were agents, servants, and employees of Defendant and were at all such times acting within the scope and course of their agency and employment or were acting as a "proxy" or "alter-ego," and/or the actions were expressly authorized by Defendant and/or their actions were ratified by Defendant, thus making Defendant liable for said actions under the doctrine of respondeat superior.

## JURISDICTION AND VENUE

5.      This Court has jurisdiction of these employment discrimination claims, and venue properly lies in this judicial district pursuant to 28 U.S.C. § 1331, 28 U.S.C. 1391, and 42 U.S.C. § 2000e-5(f)(3).

6.      Plaintiff seeks damages in an amount in excess of seventy-five thousand dollars ($75,000.00).

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

7.      On or about December 30, 2020, Plaintiff timely filed her Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") within 180 days of the acts complained of herein alleging that Defendant discriminated against and harassed her. A copy is attached hereto and incorporated herein as Exhibit A.

8.      Plaintiff's Charge of Discrimination was dually filed with the Missouri Commission on Human Rights ("MCHR").

9.      On May 6, 2021, Plaintiff was issued a Notice of Right to Sue from the EEOC. A copy is attached hereto and incorporated herein as Exhibit B.

10.     On June 29, 2021, Plaintiff was issued a Notice of Right to Sue from the MCHR. A copy is attached hereto and incorporated herein as Exhibit C.

11.     Plaintiff filed this action within ninety (90) days of the issuance of the Notices of Right to Sue from the EEOC and MCHR, and prior to the expiration of the applicable statutes of limitations. Therefore, Plaintiff's lawsuit is timely.

12.     The aforementioned Charge of Discrimination provided the EEOC and MCHR sufficient opportunity to investigate the full scope of the controversy between the parties and, accordingly, the sweep of this Complaint may be and is as broad as the scope of the EEOC and/or MCHR investigation of Plaintiff's claims and the involved parties, which could reasonably be expected to have grown out of the Charge of Discrimination.

13.     Through the filing of Plaintiff's Charge of Discrimination, Defendant was afforded notice of Plaintiff's claims and the opportunity to participate in voluntary compliance.

14.     Plaintiff has properly exhausted all administrative remedies.

## **GENERAL ALLEGATIONS**

15.     Plaintiff is female.

16.     Plaintiff is Hispanic.

17.     Plaintiff was born in the United States of America.

18.     Plaintiff has a Master of Business Administration degree.

19.     In or about July 2011, Plaintiff began her employment at Defendant as an Area Coordinator.

20.     Plaintiff worked at Defendant's facility located at 8330 Ward Parkway, Suite 220, Kansas City, Missouri 64114.

21.     Plaintiff's starting salary was approximately $30,000 per year.

22.     In or about 2012, Plaintiff received an "Area Coordinator of the Year" Award.

23.     Plaintiff received a raise in salary to approximately $40,000 per year.

24.     In or about 2013 or 2014, Defendant hired Justin Hankner, a Caucasian male, in an Area Human Resources Manager position.

25.     Mr. Hankner's starting base salary at Defendant was over $70,000 per year plus a $12,000 motor vehicle allowance.

26.     In or about May 2016, Daniel Arnold, a Caucasian male, became the Vice President of the Great Plains Region or Area Vice President and one of Plaintiff's supervisors.

27.     Mr. Arnold had four (4) rules that he instructed and expected Plaintiff and her co-workers to follow: 1. Don't lie to the boss man (Mr. Arnold), 2. Don't get your pussy where you get your paycheck, 3. Bad news doesn't get better with age, and 4. Loose lips sink ships.

28.     Mr. Arnold recited these rules to Plaintiff and her co-workers and reminded them of these rules repeatedly throughout their employment.

29.     Mr. Arnold instructed Plaintiff and her co-workers not to ask questions or speak to Mr. Arnold's superiors unless they spoke with Mr. Arnold first.

30.     When Mr. Arnold started in his position as Area Vice President, his office and Plaintiff's office shared a door.

31.     Mr. Arnold asked Plaintiff about threesomes, whether she ever used lamb skin condoms, and whether she had ever kissed a girl.

32.     Mr. Arnold told Plaintiff that, instead of sharing a door, they should put a glory hole in the wall.

33.     Plaintiff found each of the above-referenced sexual comments by Mr. Arnold to be extremely inappropriate and offensive.

34.     Mr. Arnold and/or other Caucasian co-workers made comments to Plaintiff about the wall that former President Donald Trump promised to build on the United States of America-Mexico border.

35.     Mr. Arnold and/or other Caucasian co-workers made comments to Plaintiff about keeping her and/or "her people" out of the country (United States of America).

36.     Mr. Arnold and/or other Caucasian co-workers made comments to Plaintiff insinuating that members of Plaintiff's family entered the United States of America illegally.

37.     Mr. Arnold and/or other Caucasian co-workers made comments to Plaintiff about having her deported.

38.     Mr. Arnold and/or other Caucasian co-workers made comments to Plaintiff about calling ICE (Immigration and Customs Enforcement) on her.

39.     Plaintiff found each of the above-referenced racist comments by Mr. Arnold and/or other Caucasian co-workers to be extremely inappropriate and offensive.

40.     In or about September 2016, Mr. Arnold made comments about a new rating system he used to determine how hot a woman was.

41.     Mr. Arnold stated that this new rating system would depend on how "Securitas hot" a woman was.

42.     Mr. Arnold explained that because Defendant was a male dominated workplace with few women, and few hot women especially, the scale would be lowered.

43.     Mr. Arnold stated that a woman in the real world (outside Defendant) could be a 5 but she would be an 8 on the "Securitas hot" scale.

44.     Mr. Arnold issued Plaintiff several different "Securitas hot" ratings and shared them with Plaintiff.

45.     Plaintiff found each of the above-referenced sexual comments by Mr. Arnold regarding rating the attractiveness of Plaintiff and other female employees to be extremely inappropriate, offensive, and degrading.

46.     In or about mid-December 2016, which was around the time of Mr. Arnold's birthday, Mr. Arnold directed Plaintiff, Mr. Hankner, and Kevin Marasco, a Hispanice male co-worker, to leave work and celebrate his birthday with him.

47.     Plaintiff left work to celebrate Mr. Arnold's birthday with him as instructed.

48.     When Plaintiff arrived at the restaurant she was told they were meeting at, it was clear that Mr. Arnold had been drinking and was intoxicated.

49.     After leaving the restaurant, Plaintiff, Mr. Arnold, Mr. Hankins, and Mr. Marasco went to an escape room as part of Mr. Arnold's birthday celebration.

50.     During the escape room experience, Plaintiff and Mr. Hankins were working on opening a safe when Mr. Arnold went over to them and started yelling, "I'm the boss!"

51.     As Plaintiff and Mr. Hankner were kneeling or squatting and working on opening the safe, Mr. Arnold then thrusted his pelvis toward their faces and again yelled, "I'm the boss!"

52.     When Mr. Arnold thrusted his pelvis toward the faces of Plaintiff and Mr. Hankner, his genitals brushed Plaintiff's arm and physically touched or were extremely close to physically touching Mr. Hankner's face.

53.     After the escape room, Mr. Arnold, Mr. Hanker, and Mr. Marasco went to another restaurant.

54.     At this restaurant, Mr. Arnold told Plaintiff, "Your lips are brown because you're darker." When Plaintiff gave Mr. Arnold a weird look, Mr. Arnold said, "your lips down there."

55.     Plaintiff found Mr. Arnold's above-referenced sexual comments and conduct during and after the escape room experience to be absolutely unwanted, shocking, inappropriate, offensive, degrading, and humiliating, among other things.

56.     In or about 2017, Mr. Hankner approached Plaintiff in her office with a spreadsheet containing salaries for Defendant's employees in the Great Plains region and asked Plaintiff if she wanted to know where she ranked in comparison to other Area Coordinators.

57.     Plaintiff clearly conveyed to Mr. Hankner that she did not want to review the spreadsheet or know where she ranked in comparison to other Area Coordinators.

58.     Disregarding Plaintiff's wishes, Mr. Hankner told Plaintiff that he was so sorry and that Plaintiff was the lowest paid Area Coordinator in the entire Great Plains region.

59.     In or about 2017, Mr. Hankner's salary increased to approximately $85,000 per year.

60.     Later that year, Mr. Hankner's salary increased again.

61.     In or about 2017, Plaintiff applied for and was promoted to an Area Human Resources Manager position.

62.     Upon information and belief, from in or about 2017 to present, there were between about 8 and 11 Area Human Resources Managers in the Great Plains region at Defendant.

63.     In the Area Human Resources Manager position, Plaintiff started with a base salary of approximately $65,000 plus a $12,000 motor vehicle allowance.

64.     Prior to Plaintiff being hired in the position, the job postings for Area Human Resources Manager listed a salary of $70,000-75,000.

65.     Mr. Arnold joked on multiple occasions that Plaintiff only received the promotion because David Carpenter, the Vice President of Human Resources, wanted to watch Plaintiff walk around in tight dresses and that Plaintiff better get some knee pads.

66.     Plaintiff found the above-referenced sexual comments by Mr. Arnold regarding her promotion to be very inappropriate and offensive.

67.     In or about 2017, Carolyn Rogers, a female co-worker, was promoted to an Area Coordinator position.

68.     Ms. Rogers started with a salary of about $50,000 in the Area Coordinator position.

69.     When Mr. Arnold learned of Ms. Rogers' pregnancy, he frequently called her "raw dog" and joked that she must not have used a condom.

70.     Plaintiff found the above-referenced sexual comments by Mr. Arnold to be extremely derogatory, inappropriate, and offensive.

71.     In or about 2018, Ms. Rogers' Area Coordinator position was allegedly eliminated.

72.     In or about 2018 or 2019, at least two Area Coordinator positions were sent out internally and posted externally.

73.     Shortly thereafter, Kyle Stout, a Caucasian male and District Manager, was promoted to an Area Coordinator position.

74.     Mr. Stout's starting base salary as Area Coordinator was approximately $80,000 per year plus a $12,000 motor vehicle allowance.

75.     In or about February 2018, Plaintiff attended a regional conference Defendant was hosting in Chicago, Illinois.

76.     Mr. Arnold and other co-workers were also present at this conference.

77.     One evening during the trip, Mr. Arnold informed Plaintiff that he and other co-workers were at the bar in the hotel lobby.

78.     Mr. Arnold asked Plaintiff what she was wearing.

79.     When Plaintiff replied that she was wearing jeans and a turtleneck, Mr. Arnold told her to change into something else and come down to the bar.

80.     Plaintiff did not change clothes and went down to the bar.

81.     When Plaintiff arrived at the bar, Mr. Arnold was noticeably intoxicated.

82.     At the bar, Mr. Arnold repeatedly told Plaintiff that he was going to "fuck" a woman at the bar with "high slut boots" on.

83.     Mr. Arnold missed most, if not all, mandatory meetings the following week and skipped many conference events.

84.     Plaintiff found the above-referenced sexual comments by Mr. Arnold to be extremely inappropriate, offensive, degrading, humiliating, and unprofessional.

85.     In or about 2018, Mr. Arnold frequently referred to Plaintiff as "carp" when speaking to Plaintiff and other co-workers.

86.     Mr. Arnold said that he called Plaintiff "carp" because he assumed Plaintiff had a fishy odor coming from between her legs and catfish was not as catchy to him.

87.     Plaintiff found the above referenced sexual comments by Mr. Arnold about calling Plaintiff "carp" very inappropriate, offensive, degrading, and humiliating.

88.     In or about December 2018, Mr. Arnold told Plaintiff and other employees that he created a sexual term, "the bald eagle," and entered it into urbandictionary.com.

89.     Mr. Arnold defined the sexual term as follows: "The act of placing both thumbs together with fingers extended like wings for "fingering" a female. Upon forming thumbs together

the fingers are flapped like wings and a screeching eagle sound is made as you approach the vagina to enter with thumbs together. The thumbs form the eagle head and the fingers form the flapping wings."

90.    Mr. Arnold often bragged to Plaintiff and other employees about creating the term "the bald eagle" and the sex act it involves.

91.    Mr. Arnold joked that creating the term "the bald eagle" made him a published author.

92.    Mr. Arnold frequently intertwined his thumbs, made wings with his fingers, and made bird noises when discussing women and said that they needed "the bald eagle."

93.    Plaintiff found Mr. Arnold's sexual comments and conduct regarding his reference to and use of "the bald eagle" to be extremely offensive, inappropriate, and degrading.

94.    In or about March 2019, pursuant to Defendant's policy, Plaintiff and Mr. Marasco informed Mr. Arnold, who was also Mr. Marasco's supervisor, of their intent to pursue a relationship.

95.    Mr. Arnold expressed his approval of Plaintiff and Mr. Marasco pursuing a relationship to both Plaintiff and Mr. Marasco.

96.    A few weeks later, Mr. Arnold notified Plaintiff and Mr. Marasco that his superiors had also approved Plaintiff and Mr. Marasco pursuing a relationship.

97.    Following the approval of Mr. Arnold and/or his superiors, Plaintiff and Mr. Marasco pursued a relationship together.

98.    Mr. Arnold told Plaintiff that he considered putting up cameras in the office to see if she and Mr. Marasco did anything physical so he could watch.

99.    Plaintiff found Mr. Arnold's sexual comment about putting up cameras in the office to watch Plaintiff and Mr. Marasco to see if they did anything physical to be very offensive and inappropriate.

100.    In or about 2019, Mark Wishart, a Caucasian male individual, was hired as a District Manager.

101.    Mr. Wishart's starting base salary in the District Manager position was approximately $80,000 plus a $700 monthly motor vehicle allowance.

102.    In or about May 2019, during a conference call between Mr. Arnold and a female Hispanic co-worker, Mr. Arnold entered Plaintiff's office.

103.    Upon entering Plaintiff's office, Mr. Arnold told Plaintiff how hot he thought this female Hispanic co-worker was and that he believed she wanted him to be her daddy.

104.    From this point forward, Mr. Arnold referenced this female Hispanic co-worker as his "little churro" and said that she must be spicy because she is Mexican.

105.    Mr. Arnold made comments about how he would like to "give it to" this female Hispanic co-worker and that he was going to "get it in" with her.

106.    Mr. Arnold told Plaintiff and other co-workers that Mr. Arnold needed to be like his bro (Mr. Marasco) and get a "Mexican sex slave."

107.    Plaintiff found the above-referenced sexual and/or racist comments about her fellow female Hispanic co-worker and being referred to as a "Mexican sex slave" by Mr. Arnold to be extremely offensive, inappropriate, degrading, shocking, and humiliating.

108.    From in or about 2018 through in or about 2019, Mr. Arnold and other male co-workers frequently engaged in discussions in or in close proximity to Plaintiff's office wherein numerous inappropriate, offensive, and degrading sexual comments were made.

109.    In these discussions, Plaintiff's male co-workers, including Mr. Arnold, rated the attractiveness of female employees and other female individuals entering the office from the parking lot and vice versa.

110.    In these discussions, Plaintiff's male co-workers, including Mr. Arnold, played the "would you" game where they stated whether they "would fuck" or "would not fuck" specific female employees and then give specific reasons as to why or why not.

111.    In these discussions, a reason frequently provided for why Plaintiff's male co-workers "would not fuck" a female co-worker was her body.

112.    In these discussions, Plaintiff's male co-workers, including Mr. Arnold, made comments about sexual acts and the bodies of female employees.

113.    In these discussions, Mr. Arnold commented about what he imagined female employees' pubic hair looked like.

114.    Mr. Arnold made comments about how he was called "big dick Daniel" in high school and instructed Plaintiff and her co-workers to address him as "BDD" or "Daddy."

115.    Plaintiff found all of the above-referenced sexual comments by Mr. Arnold and other male co-workers to be extremely shocking, inappropriate, offensive, degrading, and humiliating.

116.    In or about 2019, during a monthly meeting where many managers were present, a female employee made a comment regarding "penetrating the numbers" with respect to recruiting.

117.    Immediately thereafter, Mr. Arnold repeatedly used the word penetration for about five (5) minutes, mocked this female co-worker, and twisted her comment into an inappropriate and offensive rant of a sexual nature.

118.     In or about 2019, Mr. Arnold stated to Plaintiff and other employees that he created a new sexual term – "fornicatress." He explained that this was a synonym for slut and was much more professional and lady like.

119.     Mr. Arnold made a comment to Plaintiff and other employees about tickling the cervix and coming out with a little leftover and then asked, "You're not big enough to have that happen?"

120.     In the presence of Plaintiff and other co-workers, Mr. Arnold told a male co-worker that he was sending him the power of "the bald eagle" and that sex will be plentiful.

121.     Mr. Arnold made a comment to Plaintiff and other co-workers referring to a goatee as a "cum trap."

122.     Plaintiff found each of these sexual comments by Mr. Arnold to be extremely shocking, inappropriate, offensive, degrading, and humiliating.

123.     In or about September 2019, when Plaintiff's male co-workers were discussing an event one or more of them were attending, a male co-worker told Mr. Arnold, "Show her your cock."

124.     Mr. Arnold replied to this male co-worker by stating that he was definitely "gonna cum on her dress" at the event.

125.     Plaintiff found each of these sexual comments by Mr. Arnold and the other male co-worker to be absolutely shocking, inappropriate, offensive, and degrading.

126.     In or about late 2019, a male co-worker made a comment that he was going to use a boat to get the rest of Plaintiff's family over the Rio Grande.

127.     Mr. Arnold added that the boat's name is "Trump's Journey."

128.    Plaintiff found each of these racist comments by Mr. Arnold and the other male-coworker to be very inappropriate, offensive, degrading, and humiliating.

129.    In or about December 2019, Mr. Arnold made an inappropriate and offensive sexual and racist joke in the presence of Plaintiff in which he stated that he has a particular set of skills that can save Mexican girls from being sold on the black market.

130.    Plaintiff found this sexual and racist joke to be extremely inappropriate, offensive, degrading, and humiliating.

131.    In or about late 2019 or early 2020, Plaintiff received an "Area Human Resources Manager of the Year" award for 2019.

132.    In or about December 2019 or January 2020, Plaintiff asked Mr. Arnold for a raise to a base salary of $85,000 and explained to him that her performance had been consistently rated as outstanding, she had improved the talent in the Human Resources Department, and she had exceeded recruiting goals, among other things.

133.    Mr. Arnold told Plaintiff that he would discuss Plaintiff's requested raise with the Area Vice President of Human Resources and Area President and Plaintiff need not raise the issue.

134.    Plaintiff was subsequently provided a raise in base salary to $75,000.

135.    In or about late 2019 or early 2020, Mr. Arnold made a comment to Plaintiff and other co-workers that he "blew up" a co-worker's vagina the previous night.

136.    Plaintiff found this sexual comment by Mr. Arnold to be extremely inappropriate, offensive, and degrading.

137.    In or about late March or early April 2020, Defendant encouraged Plaintiff and other employees to work at home as much as possible due to the COVID-19 pandemic.

138.    In or about March 2020, Mr. Arnold made a comment to Plaintiff and other co-workers that he would take a handy in the back of a Honda right about now and suggested that Plaintiff would know what he was referring to.

139.    Mr. Arnold also made a comment to Plaintiff and other co-workers using the inappropriate and offensive analogy "like throwing a hotdog down a hallway."

140.    Plaintiff found each of these sexual comments by Mr. Arnold to be extremely inappropriate, offensive, degrading, and humiliating.

141.    In or about early-to-mid 2020, Mr. Arnold and another male co-worker discussed having employees spend the day making tortillas and then suggested selling them to all of Plaintiff's cousins and they would have 100,000 orders in no time.

142.    Plaintiff found these racist comments to be extremely inappropriate, offensive, degrading, and humiliating.

143.    In or about May 2020, Mr. Arnold told Plaintiff and other co-workers that he sent a male co-worker's wife condoms from another male co-worker with a note asking why she would ever fuck the male co-worker who is her husband.

144.    Plaintiff found this sexual comment by Mr. Arnold to be extremely inappropriate, offensive, degrading, and humiliating.

145.    In or about mid-to-late 2020, while Plaintiff was at her home in Lawrence, Kansas, Mr. Arnold sent Plaintiff text messages in which he told her to "know your role", sent Plaintiff a photograph of a female's underwear, and asked whether the underwear belonged to Plaintiff or another female.

146.    Plaintiff found Mr. Arnold's sexual comments and conduct to be absolutely shocking, inappropriate, offensive, humiliating, and intimidating.

147.     In or about mid-to-late 2020, Mr. Arnold and other male employees violated many policies and/or procedures regarding the issuance of guard cards and discipline of employees for sleeping while on duty.

148.     When Plaintiff brought policy violations to the attention of Defendant, she was instructed to report the policy violations to Mr. Arnold and told that Mr. Arnold would handle it.

149.     In or about July 2020, Mr. Arnold, Mr. Marasco, and other male co-workers went to dinner one evening.

150.     During the dinner, Mr. Arnold and at least one other male co-worker made explicit comments about Plaintiff's body.

151.     Mr. Marasco told Mr. Arnold to stop making explicit comments about Plaintiff's body.

152.     Defendant terminated Mr. Marasco's employment.

153.     Plaintiff found Mr. Arnold's sexual comments about her to be extremely inappropriate, offensive, degrading, and humiliating.

154.     From in or about March 2020 through in or about November 2020, Plaintiff worked remotely from her residence in Lawrence, Kansas due to the COVID-19 pandemic.

155.     When Plaintiff worked remotely from her residence in Lawrence, Kansas from in or about March 2020 to in or about November 2020, Mr. Arnold made numerous racist and sexual comments to Plaintiff over the phone and during virtual meetings.

156.     Defendant did not have a policy or procedure and/or did not enforce a policy or procedure that would have allowed Plaintiff to make a complaint of discrimination or harassment against Mr. Arnold without Mr. Arnold being notified of said complaint and Plaintiff facing retaliation from Mr. Arnold.

157.    On or about November 9, 2020, due to the sexual and racial harassment and discrimination Plaintiff had been subjected to, Plaintiff resigned from her employment at Defendant.

158.    When Plaintiff resigned, her pay remained significantly less than that of Caucasian and/or male co-workers in the same or similar position.

159.    When Plaintiff resigned, her pay remained significantly less that that of Caucasian and/or male co-workers in subordinate positions.

160.    Throughout her employment at Defendant, Plaintiff's was consistently recognized for her outstanding job performance.

161.    On or about November 10, 2020, Plaintiff participated in a meeting with Melissa Wigger, Vice President of Human Resources.

162.    During Plaintiff's meeting with Ms. Wigger, Plaintiff reported the sexual and racial harassment and discrimination she had endured at Defendant over the course of the past four years and that she could not take it any longer.

163.    During Plaintiff's meeting with Ms. Wigger, Plaintiff reported Mr. Arnold's rant when he intentionally used different forms of the word "penetration" numerous times in a sexual manner in a virtual meeting with Plaintiff and other co-workers, including the Human Resources Manager in Wichita.

164.    During Plaintiff's meeting with Ms. Wigger, Plaintiff reported Mr. Arnold's sexual comments in which he referred to Ms. Rogers as "raw dog Carolyn" and joked that if she had used condoms, she would not be pregnant.

165.    During Plaintiff's meeting with Ms. Wigger, Plaintiff reported that Mr. Arnold and David Turner, Branch Manager, often went into her office when female co-workers walked to and

from the parking lot to the building and asked each other whether they "would fuck" female co-workers, including Plaintiff.

166.     During Plaintiff's meeting with Ms. Wigger, Plaintiff reported that Mr. Arnold and other male co-workers often made racist comments to her or in her presence from the time Donald Trump was running for President in the fall of 2016 throughout the remainder of his presidency, including, but not limited to, comments about Trump building a wall along the United States of America and Mexico border and insinuating that Plaintiff's family lived in Mexico and suggesting that she bring her family from Mexico to the United States of America.

167.     During Plaintiff's meeting with Ms. Wigger, Plaintiff reported that Mr. Arnold had four (4) rules that he instructed and expected Plaintiff and her co-workers to follow: 1. Don't lie to the boss man (Mr. Arnold), 2. Don't get your pussy where you get your paycheck, 3. Bad news doesn't get better with age, and 4. Loose lips sink ships.

168.     During Plaintiff's meeting with Ms. Wigger, Plaintiff explained that she was intimidated and scared of Mr. Arnold and what he would do if she complained about him.

169.     During Plaintiff's meeting with Ms. Wigger, Plaintiff explained that if she complained against Mr. Arnold, Mr. Arnold would have been informed of said complaint.

170.     During Plaintiff's meeting with Ms. Wigger, Plaintiff explained that she was afraid that if she complained, she would lose her job.

171.     Ms. Wigger told Plaintiff that she would look into her report of sexual and racial harassment and discrimination.

172.     Ms. Wigger never followed up with Plaintiff following their meeting regarding sexual and racial harassment and discrimination at Defendant.

173.    Defendant continuously discriminated against and harassed Plaintiff based on her sex and race throughout her employment.

174.    Defendant's continuous unlawful discrimination and harassment against Plaintiff based on her sex and race throughout her employment constitute an ongoing pattern or practice of discrimination and harassment, thereby resulting in a continuing violation.

## COUNT I
## MHRA (R.S.Mo. § 213.055)
### Sexual Harassment/Hostile Work Environment

175.    Plaintiff incorporates by reference all other paragraphs as if fully set forth herein.

176.    Plaintiff is a member of a legally protected class due to her sex.

177.    Plaintiff was subjected to the above referenced sexual comments and/or conduct by Defendant.

178.    The sexual comments and/or conduct Plaintiff was subjected to by Defendant were unwelcome.

179.    The sexual comments and/or conduct Plaintiff was subjected to by Defendant were frequent, severe, humiliating, offensive, and affected the terms, conditions, and/or privileges of Plaintiff's employment.

180.    Defendant's sexual comments and/or conduct toward Plaintiff were because of Plaintiff's sex.

181.    Defendant knew of the offensive, harassing, and discriminatory sexual comments and/or conduct and failed to exercise reasonable care to prevent and promptly correct the sexual comments and/or conduct.

182.    Defendant failed to make a good-faith effort to establish and enforce policies to prevent illegal sexual harassment against its employees.

183.    Defendant failed to properly train and/or otherwise inform supervisors and employees concerning their duties and obligations under the MHRA.

184.    Defendant failed to stop the sexual comments and/or conduct, exacerbating the sexual harassment against Plaintiff.

185.    Mr. Arnold and other male managers committed the sexual harassment while acting within the scope of their employment at Defendant.

186.    Defendant's pattern and practice of sexual harassment against Plaintiff resulted in a hostile work environment based on sex.

187.    Defendant's sexual comments and/or conduct resulted in working conditions that were so intolerable that a reasonable employee would feel forced to resign.

188.    Defendant intended to force Plaintiff to resign or reasonably foresaw or should have foreseen that its sexual comments and/or conduct would force Plaintiff to resign.

189.    Plaintiff resigned from her employment at Defendant due to working conditions which she perceived to be intolerable, thereby resulting in her constructive discharge.

190.    As a direct and proximate result of Defendant's unlawful sexual comments and/or conduct described above, Plaintiff has suffered damages, including, but not limited to, pain and suffering, loss of past and future wages and benefits, loss of enjoyment of life, and other non-pecuniary losses.

191.    As a direct and proximate result of Defendant's unlawful sexual comments and/or conduct described above, Plaintiff has suffered garden variety emotional distress damages, including, but not limited to, embarrassment, degradation, humiliation, and various other forms of garden variety emotional distress.

192.     Defendant's conduct was intentional, malicious, and/or outrageous and evidenced an evil motive or conscious disregard for the rights of others, entitling Plaintiff to an award of punitive damages.

193.     Any cap of limitation on Plaintiff's damages that may be imposed by R.S.Mo. § 213.111.4 (2017) is unconstitutional in that it violates her right to trial by jury, Mo. Const. Art. I, § 22(a); separation of powers, Mo. Const. Art. II, § 1; the right to equal protection, Mo. Const. Art. I, § 2; the prohibition on special legislation, Mo. Const. Art. III, § 40; and the right to due process, Mo. Const. Art. I, § 10.

WHEREFORE, Plaintiff prays that this honorable Court enter judgment in her favor and against Defendant for such damages as are fair and reasonable, including compensatory damages, punitive damages, pre- and post-judgment interest, attorney's fees and costs, all in an amount over $25,000.00 and for injunctive relief, and for such additional relief as may be just and proper under the circumstances.

### COUNT II
### Title VII (42 U.S.C.A. § 2000e)
### Sexual Harassment/Hostile Work Environment

194.     Plaintiff incorporates by reference all other paragraphs as if fully set forth herein.

195.     Plaintiff is a member of a legally protected class due to her sex.

196.     Plaintiff was subjected to the above referenced sexual comments and/or conduct throughout her employment with Defendant.

197.     Such sexual comments and/or conduct were unwelcome.

198.     Such sexual comments and/or conduct were based on Plaintiff's sex.

199.     Such sexual comments and/or conduct were sufficiently severe or pervasive to alter the conditions of Plaintiff's employment and create an abusive or hostile working environment.

200.    Such sexual comments detrimentally affected Plaintiff.

201.    At the time such sexual comments were made and/or conduct occurred, and as a result of such sexual comments and/or conduct, Plaintiff found the work environment to be hostile and abusive.

202.    Defendant's management-level employees knew or should have known of the alleged sexual harassment and yet failed to take prompt and appropriate corrective action reasonably calculated to stop the harassment.

203.    Defendant failed to make a good-faith effort to establish and enforce policies to prevent illegal discrimination against its employees, including harassment based on sex.

204.    Defendant failed to properly train and/or otherwise inform supervisors and employees concerning their duties and obligations under the civil rights laws, including Title VII.

205.    Defendant failed to stop the unwelcome comments and/or conduct, exacerbating the harassment of Plaintiff based on her sex.

206.    Mr. Arnold acted with malice or reckless indifference to Plaintiff's federally protected right to a work environment free from sexual harassment.

207.    Mr. Arnold and other male managers committed the harassment while acting within the scope of their employment at Defendant.

208.    Defendant engaged in a pattern and practice of sexual harassment against Plaintiff, which created a hostile work environment based on sex.

209.    A reasonable person would find that Plaintiff's work environment was hostile, abusive, and intolerable.

210.    Such sexual comments and/or conduct would have detrimentally affected a reasonable person of the same sex in Plaintiff's position.

211.    Defendant intended to force Plaintiff to resign or reasonably foresaw or should have foreseen that its sexual comments and/or conduct would force Plaintiff to resign.

212.    Plaintiff resigned from her employment at Defendant due to working conditions which she perceived to be intolerable, thereby resulting in her constructive discharge.

213.    As a direct and proximate result of Defendant's unlawful comments and/or conduct described above, Plaintiff has suffered damages, including, but not limited to, pain and suffering, loss of past and future wages and benefits, garden variety emotional distress in the form of embarrassment, degradation, humiliation, and various other forms of garden variety emotional distress, loss of enjoyment of life, and other non-pecuniary losses.

214.    Defendant's comments and/or conduct were outrageous and evidence an evil motive or reckless indifference for the rights of Plaintiff and the rights of others, entitling Plaintiff to an award of punitive damages.

WHEREFORE, Plaintiff prays that this honorable Court enter judgment in her favor and against Defendant for such damages as are fair and reasonable, including compensatory damages, punitive damages, pre- and post-judgment interest, attorney's fees and costs, all in an amount over $25,000.00 and for injunctive relief, and for such additional relief as may be just and proper under the circumstances.

## COUNT III
### MHRA (R.S.Mo. § 213.055)
### Harassment/Hostile Work Environment Based on Race

215.    Plaintiff incorporates by reference all other paragraphs as if fully set forth herein.

216.    Plaintiff is a member of a legally protected class due to her race.

217.    Plaintiff was subjected to the above referenced racial comments and/or conduct by Defendant.

218.    The racial comments and/or conduct Plaintiff was subjected to by Defendant were unwelcome.

219.    The racial comments and/or conduct Plaintiff was subjected to by Defendant were frequent, severe, humiliating, offensive, and affected the terms, conditions, and/or privileges of Plaintiff's employment.

220.    Defendant's racial comments and/or conduct toward Plaintiff were because of Plaintiff's race.

221.    Defendant knew of the offensive, harassing, and discriminatory racial comments and/or conduct and failed to exercise reasonable care to prevent and promptly correct the racial comments and/or conduct.

222.    Defendant to make a good-faith effort to establish and enforce policies to prevent illegal racial harassment against its employees.

223.    Defendant failed to properly train and/or otherwise inform supervisors and employees concerning their duties and obligations under the MHRA.

224.    Defendant failed to stop the racial comments and/or conduct, exacerbating the racial harassment against Plaintiff.

225.    Mr. Arnold and other Caucasian managers committed the racial harassment while acting within the scope of their employment at Defendant.

226.    Defendant's pattern and practice of racial harassment against Plaintiff resulted in a hostile work environment based on race.

227.    Defendant's racial comments and/or conduct resulted in working conditions that were so intolerable that a reasonable employee would feel forced to resign.

228.     Defendant intended to force Plaintiff to resign or reasonably foresaw or should have foreseen that its racial comments and/or conduct would force Plaintiff to resign.

229.     Plaintiff resigned from her employment at Defendant due to working conditions which she perceived to be intolerable, thereby resulting in her constructive discharge.

230.     As a direct and proximate result of Defendant's unlawful racial comments and/or conduct described above, Plaintiff has suffered damages, including, but not limited to, pain and suffering, loss of past and future wages and benefits, loss of enjoyment of life, and other non-pecuniary losses.

231.     As a direct and proximate result of Defendant's unlawful racial comments and/or conduct described above, Plaintiff has suffered garden variety emotional distress damages, including, but not limited to, embarrassment, degradation, humiliation, and various other forms of garden variety emotional distress.

232.     Defendant's conduct was intentional, malicious, and/or outrageous and evidenced an evil motive or conscious disregard for the rights of others, entitling Plaintiff to an award of punitive damages.

233.     Any cap of limitation on Plaintiff's damages that may be imposed by R.S.Mo. § 213.111.4 (2017) is unconstitutional in that it violates her right to trial by jury, Mo. Const. Art. I, § 22(a); separation of powers, Mo. Const. Art. II, § 1; the right to equal protection, Mo. Const. Art. I, § 2; the prohibition on special legislation, Mo. Const. Art. III, § 40; and the right to due process, Mo. Const. Art. I, § 10.

WHEREFORE, Plaintiff prays that this honorable Court enter judgment in her favor and against Defendant for such damages as are fair and reasonable, including compensatory damages, punitive damages, pre- and post-judgment interest, attorney's fees and costs, all in an amount over

$25,000.00 and for injunctive relief, and for such additional relief as may be just and proper under the circumstances.

<u>**COUNT IV**</u>
**Title VII (42 U.S.C.A. § 2000e)**
**Harassment/Hostile Work Environment Based on Race**

234.    Plaintiff incorporates by reference all other paragraphs as if fully set forth herein.

235.    Plaintiff is a member of a legally protected class due to her race.

236.    Plaintiff was subjected to the above referenced racial comments and/or conduct throughout her employment with Defendant.

237.    Such racial comments and/or conduct were unwelcome.

238.    Such racial comments and/or conduct were based on Plaintiff's race.

239.    Such racial comments and/or conduct were sufficiently severe or pervasive to alter the conditions of Plaintiff's employment and create an abusive or hostile working environment.

240.    Such racial comments detrimentally affected Plaintiff.

241.    At the time such racial comments were made and/or conduct occurred, and as a result of such racial comments and/or conduct, Plaintiff found the work environment to be hostile and abusive.

242.    Defendant's management-level employees knew or should have known of the alleged racial harassment and yet failed to take prompt and appropriate corrective action reasonably calculated to stop the harassment.

243.    Defendant failed to make a good-faith effort to establish and enforce policies to prevent illegal harassment based on race.

244.    Defendant failed to properly train and/or otherwise inform supervisors and employees concerning their duties and obligations under Title VII.

245.    Defendant failed to stop the racial comments and/or conduct, exacerbating the harassment of Plaintiff based on her race.

246.    Mr. Arnold acted with malice or reckless indifference to Plaintiff's federally protected right to a work environment free from racial harassment.

247.    Mr. Arnold and other Caucasian managers committed the racial harassment while acting within the scope of their employment at Defendant.

248.    Defendant engaged in a pattern and practice of racial harassment against Plaintiff, which created a hostile work environment based on race.

249.    A reasonable person would find that Plaintiff's work environment was hostile, abusive, and intolerable.

250.    Such racial comments and/or conduct would have detrimentally affected a reasonable person of the same race in Plaintiff's position.

251.    Defendant intended to force Plaintiff to resign or reasonably foresaw or should have foreseen that its racial comments and/or conduct would force Plaintiff to resign.

252.    Plaintiff resigned from her employment at Defendant due to working conditions which she perceived to be intolerable, thereby resulting in her constructive discharge.

253.    As a direct and proximate result of Defendant's unlawful comments and/or conduct described above, Plaintiff has suffered damages, including, but not limited to, pain and suffering, loss of past and future wages and benefits, garden variety emotional distress in the form of embarrassment, degradation, humiliation, and various other forms of garden variety emotional distress, loss of enjoyment of life, and other non-pecuniary losses.

254.     Defendant's comments and/or conduct were outrageous and evidence an evil motive or reckless indifference for the rights of Plaintiff and the rights of others, entitling Plaintiff to an award of punitive damages.

WHEREFORE, Plaintiff prays that this honorable Court enter judgment in her favor and against Defendant for such damages as are fair and reasonable, including compensatory damages, punitive damages, pre- and post-judgment interest, attorney's fees and costs, all in an amount over $25,000.00 and for injunctive relief, and for such additional relief as may be just and proper under the circumstances.

### COUNT V
### MHRA (R.S.Mo. § 215.055)
### Disparate Treatment Based on Sex

255.     Plaintiff incorporates by reference all other paragraphs as if fully set forth herein.

256.     Plaintiff is a member of a legally protected class due to her sex.

257.     Plaintiff was subjected to the above referenced disparate treatment based on her sex by Defendant.

258.     Defendant's conduct described above constitutes unlawful disparate treatment based on sex in violation of the MHRA.

259.     Plaintiff was treated differently than similarly situated male employees on the basis of her sex.

260.     Defendant's conduct toward Plaintiff was because of Plaintiff's sex.

261.     Defendant knew of the discriminatory conduct against Plaintiff and failed to exercise reasonable care to prevent and promptly correct the discriminatory conduct.

262.     A term, condition, or privilege of Plaintiff's employment was affected by the disparate treatment against her based on her sex.

263.     Defendant failed to make a good-faith effort to establish and enforce policies to prevent illegal sex discrimination against its employees.

264.     Defendant failed to properly train and/or otherwise inform supervisors and employees concerning their duties and obligations under the MHRA.

265.     Defendant engaged in a pattern and practice of disparate treatment based on sex against Plaintiff.

266.     Defendant's discriminatory conduct resulted in working conditions that were intolerable, such that a reasonable employee would be forced to resign from their position.

267.     Defendant intended to force Plaintiff to resign, or reasonably foresaw that its discriminatory conduct would cause Plaintiff to resign.

268.     Plaintiff resigned from her employment at Defendant due to working conditions which she perceived to be intolerable, thereby resulting in her constructive discharge.

269.     As a direct and proximate result of Defendant's unlawful comments and/or conduct described above, Plaintiff has suffered damages, including, but not limited to, pain and suffering, loss of past and future wages and benefits, loss of enjoyment of life, and other non-pecuniary losses.

270.     As a direct and proximate result of Defendant's unlawful actions described above, Plaintiff has suffered garden variety emotional distress damages, including, but not limited to, embarrassment, degradation, humiliation, and various other forms of garden variety emotional distress.

271.     Defendant's conduct was intentional, malicious, and/or outrageous and evidenced an evil motive or conscious disregard for the rights of others, entitling Plaintiff to an award of punitive damages.

272.     Any cap or limitation on Plaintiff's damages that may be imposed by R.S.Mo. § 213.111.4 (2017) is unconstitutional in that it violates Plaintiff's right to trial by jury, Mo. Const., Art. I § 22(a); separation of powers, Mo. Const., Art. II § 1; the right to equal protection, Mo. Const., Art. I § 2; the prohibition on special legislation, Mo. Const., Art. III § 40; and the right to due process, Mo. Const., Art. I § 10.

WHEREFORE, Plaintiff prays that this honorable Court enter judgment in her favor and against Defendant for such damages as are fair and reasonable, including lost wages and other benefits of employment, compensatory damages, punitive damages, pre- and post-judgment interest, future lost wages and benefits of employment, attorney's fees and costs, all in an amount over $25,000.00 and for injunctive relief, and for such additional relief as may be just and proper under the circumstances.

**COUNT VI**
**Title VII (42 U.S.C.A. § 2000e)**
**Disparate Treatment Based on Sex**

273.     Plaintiff incorporates by reference all other paragraphs as if fully set forth herein.

274.     Plaintiff is a member of a legally protected class due to her sex.

275.     Plaintiff was subjected to the above referenced disparate treatment based on her sex by Defendant.

276.     Defendant's conduct described above constitutes unlawful disparate treatment based on sex in violation of Title VII.

277.     Plaintiff was treated differently than similarly situated male employees on the basis of her sex.

278.     Plaintiff's sex was a motivating factor in Defendant's discriminatory conduct toward her.

279.     Defendant knew of the discriminatory conduct against Plaintiff and failed to exercise reasonable care to prevent and promptly correct the discriminatory conduct.

280.     A term, condition, or privilege of Plaintiff's employment was affected by the disparate treatment against her based on her sex.

281.     Defendant failed to make a good-faith effort to establish and enforce policies to prevent illegal sex discrimination against its employees.

282.     Defendant failed to properly train and/or otherwise inform supervisors and employees concerning their duties and obligations under the civil rights laws, including Title VII.

283.     Defendant engaged in a pattern and practice of disparate treatment based on sex against Plaintiff.

284.     Defendant intentionally made Plaintiff's working conditions so intolerable that a reasonable person would feel forced to resign.

285.     Plaintiff resigned from her employment at Defendant due to working conditions which she perceived to be intolerable, thereby resulting in her constructive discharge.

286.     As a direct and proximate result of Defendant's unlawful comments and/or conduct described above, Plaintiff has suffered damages, including, but not limited to, pain and suffering, loss of past and future wages and benefits, loss of enjoyment of life, and other non-pecuniary losses.

287.     As a direct and proximate result of Defendant's unlawful discriminatory conduct described above, Plaintiff has suffered garden variety emotional distress damages, including, but not limited to, embarrassment, degradation, humiliation, and various other forms of garden variety emotional distress.

288.    Defendant's discriminatory conduct was intentional, malicious, and/or outrageous and evidenced an evil motive or conscious disregard for the rights of others, entitling Plaintiff to an award of punitive damages.

WHEREFORE, Plaintiff prays that this honorable Court enter judgment in her favor and against Defendant for such damages as are fair and reasonable, including lost wages and other benefits of employment, compensatory damages, punitive damages, pre- and post-judgment interest, future lost wages and benefits of employment, attorneys fees and costs, all in an amount over $25,000.00 and for injunctive relief, and for such additional relief as may be just and proper under the circumstances.

## COUNT VII
## MHRA (R.S.Mo. § 215.055)
## Disparate Treatment Based on Race

289.    Plaintiff incorporates by reference all other paragraphs as if fully set forth herein.

290.    Plaintiff is a member of a legally protected class due to her race.

291.    Plaintiff was subjected to the above referenced disparate treatment based on her race by Defendant.

292.    Defendant's conduct described above constitutes unlawful disparate treatment based on race in violation of the MHRA.

293.    Plaintiff was treated differently than similarly situated Caucasian employees on the basis of her race.

294.    Defendant's conduct toward Plaintiff was because of Plaintiff's race.

295.    Defendant knew of the discriminatory conduct against Plaintiff and failed to exercise reasonable care to prevent and promptly correct the discriminatory conduct.

296.    A term, condition, or privilege of Plaintiff's employment was affected by the disparate treatment against her based on her race.

297.    Defendant failed to make a good-faith effort to establish and enforce policies to prevent illegal race discrimination against its employees.

298.    Defendant failed to properly train and/or otherwise inform supervisors and employees concerning their duties and obligations under the MHRA.

299.    Defendant engaged in a pattern and practice of disparate treatment based on race against Plaintiff.

300.    Defendant's discriminatory conduct resulted in working conditions that were intolerable, such that a reasonable employee would be forced to resign from their position.

301.    Defendant intended to force Plaintiff to resign, or reasonably foresaw that its discriminatory conduct would cause Plaintiff to resign.

302.    Plaintiff resigned from her employment at Defendant due to working conditions which she perceived to be intolerable, thereby resulting in her constructive discharge.

303.    As a direct and proximate result of Defendant's unlawful discriminatory conduct described above, Plaintiff has suffered damages, including, but not limited to, pain and suffering, loss of past and future wages and benefits, loss of enjoyment of life, and other non-pecuniary losses.

304.    As a direct and proximate result of Defendant's unlawful discriminatory conduct described above, Plaintiff has suffered garden variety emotional distress damages, including, but not limited to, embarrassment, degradation, humiliation, and various other forms of garden variety emotional distress.

305.     Defendant's discriminatory conduct was intentional, malicious, and/or outrageous and evidenced an evil motive or conscious disregard for the rights of others, entitling Plaintiff to an award of punitive damages.

306.     Any cap or limitation on Plaintiff's damages that may be imposed by R.S.Mo. § 213.111.4 (2017) is unconstitutional in that it violates Plaintiff's right to trial by jury, Mo. Const., Art. I § 22(a); separation of powers, Mo. Const., Art. II § 1; the right to equal protection, Mo. Const., Art. I § 2; the prohibition on special legislation, Mo. Const., Art. III § 40; and the right to due process, Mo. Const., Art. I § 10.

WHEREFORE, Plaintiff prays that this honorable Court enter judgment in her favor and against Defendant for such damages as are fair and reasonable, including lost wages and other benefits of employment, compensatory damages, punitive damages, pre- and post-judgment interest, future lost wages and benefits of employment, attorney's fees and costs, all in an amount over $25,000.00 and for injunctive relief, and for such additional relief as may be just and proper under the circumstances.

## COUNT VIII
### Title VII (42 U.S.C.A. § 2000e)
### Disparate Treatment Based on Race

307.     Plaintiff incorporates by reference all other paragraphs as if fully set forth herein.

308.     Plaintiff is a member of a legally protected class due to her race.

309.     Plaintiff was subjected to the above referenced disparate treatment based on her race by Defendant.

310.     Defendant's conduct described above constitutes unlawful disparate treatment based on race in violation of Title VII.

311.    Plaintiff was treated differently than similarly situated Caucasian employees on the basis of her race.

312.    Plaintiff's race was a motivating factor in Defendant's discriminatory conduct toward her.

313.    Defendant knew of the discriminatory conduct against Plaintiff and failed to exercise reasonable care to prevent and promptly correct the discriminatory conduct.

314.    A term, condition, or privilege of Plaintiff's employment was affected by the disparate treatment against her based on her race.

315.    Defendant failed to make a good-faith effort to establish and enforce policies to prevent illegal race discrimination against its employees.

316.    Defendant failed to properly train and/or otherwise inform supervisors and employees concerning their duties and obligations under Title VII.

317.    Defendant engaged in a pattern and practice of disparate treatment based on race against Plaintiff.

318.    Defendant intentionally made Plaintiff's working conditions so intolerable that a reasonable person would feel forced to resign.

319.    Plaintiff resigned from her employment at Defendant due to working conditions which she perceived to be intolerable, thereby resulting in her constructive discharge.

320.    As a direct and proximate result of Defendant's unlawful comments and/or conduct described above, Plaintiff has suffered damages, including, but not limited to, pain and suffering, loss of past and future wages and benefits, loss of enjoyment of life, and other non-pecuniary losses.

321.    As a direct and proximate result of Defendant's unlawful discriminatory conduct described above, Plaintiff has suffered garden variety emotional distress damages, including, but not limited to, embarrassment, degradation, humiliation, and various other forms of garden variety emotional distress.

322.    Defendant's discriminatory conduct was intentional, malicious, and/or outrageous and evidenced an evil motive or conscious disregard for the rights of others, entitling Plaintiff to an award of punitive damages.

WHEREFORE, Plaintiff prays that this honorable Court enter judgment in her favor and against Defendant for such damages as are fair and reasonable, including lost wages and other benefits of employment, compensatory damages, punitive damages, pre- and post-judgment interest, future lost wages and benefits of employment, attorney's fees and costs, all in an amount over $25,000.00 and for injunctive relief, and for such additional relief as may be just and proper under the circumstances.

## JURY TRIAL DEMAND

PLAINTIFF REQUESTS A TRIAL BY JURY AS TO ALL ISSUES SO TRIABLE.

Respectfully submitted,

**Burkhart Law, LLC**

 /s/ *Kyle E. Murphy*
Kyle E. Murphy #78836
4233 Roanoke Road, Suite 100
Kansas City, Missouri 64111
Phone: (816) 945-6467
Facsimile: (816) 945-6314
kyle@burkhartlegal.com
ATTORNEY FOR PLAINTIFF